In the Interest of G.T.M., minor.

W.S., Father, Respondent–Appellant,

v.

Greene County Juvenile Office,
Petitioner–Respondent.

No. SD 31470.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 29, 2012.

John E. Kelly, Springfield, MO, for Appellant.

William C. Prince, Springfield, MO, for Respondent.

Margaret E. Branyan–Barker, Springfield, MO, Division II, for Minor.

JEFFREY W. BATES, Judge.

W.S. (Father) appeals from a judgment terminating his parental rights to his son, G.T.M.[1] The trial court terminated Father's parental rights based on the statutory grounds of abandonment and neglect. *See* § 211.447.5(1); § 211.447.5(2).[2] On appeal, Father contends the court erred in terminating his parental rights on either ground because he learned of his paternity only one month before the petition to terminate his parental rights was filed, and he expressed interest in caring for his son. We reverse that part of the judgment terminating Father's parental rights to G.T.M.[3]

## I. Standard of Review

To terminate parental rights, a trial court must use a two-step analysis. *In re B.H.*, 348 S.W.3d 770, 776 (Mo. banc 2011). In the first step, the court must find by clear, cogent and convincing evi-

---

1. The parental rights of G.T.M.'s biological mother also were terminated and are the subject of a separate appeal. In this appeal, we address only those parts of the judgment terminating Father's parental rights.

2. All references to statutes are to RSMo Cum. Supp. (2009).

3. The judgment also terminated the biological mother's parental rights. In this appeal, we reverse only that part of the judgment concerning the termination of Father's parental rights. In the biological mother's separate appeal, we affirmed those portions of the judgment terminating her parental rights.

dence that one or more statutory grounds for termination exist. § 211.447.6; *B.H.*, 348 S.W.3d at 776; *In re P.L.O.*, 131 S.W.3d 782, 788 (Mo. banc 2004). This clear, cogent and convincing standard of proof, which the trial court must apply, is met when the evidence instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true. *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011). After finding that at least one statutory ground for termination has been proven, the trial court then moves to the second step and must determine, by a preponderance of the evidence, whether the termination of parental rights is in the child's best interest. § 211.447.6; *B.H.*, 348 S.W.3d at 776; *P.L.O.*, 131 S.W.3d at 788–89.

▇▇▇▇▇ On appeal, we review a decision that there are statutory grounds for termination by determining whether the ruling is supported by substantial evidence, is against the weight of the evidence, or involves an erroneous application or declaration of the law. *B.H.*, 348 S.W.3d at 773; *C.M.B.R.*, 332 S.W.3d at 815. We will not reverse the trial court's decision unless we are left with the firm belief that the decision was wrong. *C.M.B.R.*, 332 S.W.3d at 815. Conflicting evidence will be reviewed in the light most favorable to the judgment of the trial court. *Id.* We defer to the trial court's assessment of credibility. *Id.* "When the evidence poses two reasonable but different inferences, this Court is obligated to defer to the trial court's assessment of the evidence." *Id.* In addition, this Court views the record favorably to the judgment. *In re Z.L.R.*, 306 S.W.3d 632, 633 n. 2 (Mo.App.2010). We are mindful, however, that "termination of pa-

rental rights is an exercise of awesome power and strict and literal compliance with the statutory language is demanded. The party seeking to invoke the statute must carry the full burden of proof." *In Interest of Baby Girl W.*, 728 S.W.2d 545, 547 (Mo.App.1987); *see In re A.S.W.*, 137 S.W.3d 448, 453 (Mo. banc 2004) (statutes providing for the termination of parental rights "are strictly construed in favor of the parent and preservation of the natural parent-child relationship").

## II. Factual and Procedural Background

The facts in this case are largely undisputed. G.T.M. was born on August 10, 2009. Following his birth, he was initially released to his biological mother's care. She later tested positive for methamphetamine, and two-month-old G.T.M. was taken into protective custody on October 5, 2009. At that time, G.T.M.'s father was thought to be G.M. His subsequent paternity test, however, revealed a zero probability that he was G.T.M.'s biological father.[4]

Kiatah Grady (Grady), a caseworker with the Children's Division (Division), was in charge of G.T.M.'s case. In July 2010, Grady first became aware that the biological father might be Father, who was incarcerated at the time. On July 22, 2010, Grady wrote a letter to Father stating that he could be a possible father to a child in care and asking him if he would submit to a paternity test. On July 29, 2010, Father responded by letter that he agreed to be tested for paternity. Grady notified the Child Support Enforcement Division (CSED), which was in charge of administering the paternity test. The test could not be completed for several weeks. Fa-

---

**4.** At the beginning of trial in this matter, the trial court made a specific finding that G.M. was not the father and ordered his dismissal from the case.

ther stayed in contact with Grady during that time, primarily by writing letters.

On August 20, 2010, a petition was filed to terminate the parental rights of G.T.M.'s biological mother. The petition also sought to terminate the parental rights of G.T.M.'s "unknown biological father."

In late September 2010, the CSED administered the paternity test to Father. Grady received the results that Father was G.T.M.'s biological father in mid-October 2010. Grady did not notify Father of the results until the following month, however, after she had time to prepare an incarcerated parent treatment plan and have it approved by the court.

On November 23, 2010, Grady sent Father a letter notifying him that he was G.T.M.'s father. Grady also sent Father his treatment plan, along with other information as to how to participate in his child's life. Father signed the treatment plan and other documents, as requested, and promptly sent the signed documents back to Grady. She received these documents on December 13, 2010.

On December 28, 2010, an amended petition was filed to terminate the parental rights of both the biological mother and of Father, identifying him for the first time as the biological father. The amended petition alleged that Father both abandoned and neglected G.T.M. With respect to abandonment, the amended petition alleged that G.T.M. had been without contact from Father "for the six [months] prior to the filing of the Petition."

Soon after Father learned that he was G.T.M.'s biological father, and before Father learned that the amended petition had been filed, he sent G.T.M. a letter, which was considered appropriate by Grady. Father also expressed his intention to have custody of his son and to have his son placed in his family's custody until his expected release date in April 2012. After the amended petition was filed, Father continued to maintain contact with Grady through late March 2011. The termination trial was held on April 6, 2011. Father's mother also has maintained regular contact with Grady, calling her a dozen times and asking how G.T.M. was doing, about his clothing sizes, etc. At the time of trial, a home study of her home had been completed.[5]

With respect to Father's treatment plan, Grady testified Father had done everything asked of him except provide verification of completing parenting classes or other programs while incarcerated.[6] Since Father's paternity was established, Grady was uncertain whether he had been ordered to pay child support. She had no knowledge of Father paying any child support or providing any in-kind support.[7] In addition, Father did not provide Grady with any plans of what he was going to do when he was released from prison. Grady recommended that Father's parental rights be terminated and opined that termination would be in G.T.M.'s best interest. The GAL was also at trial and similarly recommended termination of Father's parental rights to G.T.M. and opined it would be in his best interest.

In closing, Father's counsel argued:

the programs that Father had enrolled in while incarcerated.

---

5. The results of that study were not discussed at the trial.

6. Grady's testimony only addressed the verification of completion requirement. At a later point in the trial, Father's Exhibit B was admitted in evidence. This exhibit showed

7. There is no evidence in the record, however, of Father's present income, if any, while in prison.

Judge, I just don't see how we can do abandonment, when this guy was notified just a little over 30 days before the petition for termination was filed against him. He was notified the end of November that he was the father of this child. The supplemental petition adding him as the father was filed on December 28th. And you're supposed to allege abandonment within the previous six months. I realize that that's statutory inference or presumption; however, I believe that his intense interest evidenced by his letters and his family's interest overcome that inference.

Thereafter, the court entered its findings of fact, conclusions of law and judgment terminating Father's parental rights to G.T.M. The court found that Father: (1) abandoned G.T.M. pursuant to § 211.447.5(1); and (2) neglected G.T.M. pursuant to § 211.447.5(2). This appeal followed.

### III. Discussion and Decision

#### Point I

■ In Father's first point, he contends the trial court's finding on the statutory ground of abandonment is not supported by substantial evidence. In relevant part, § 211.447.5(1)(b) states that "[t]he court shall find that the child has been abandoned if, *for a period of six months or longer* ... (b) The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so[.]" *Id.* (emphasis added); *see In re J.M.S.,* 83 S.W.3d 76, 82 (Mo.App.2002). In this case, the trial court found:

The minor child has been abandoned by the father. The father has not maintained consistent or regular contact with the child who was at the time of the filing of the petition under the age of

one year. The father, although incarcerated has not maintained even minimal contact with the child. The father has made no effort to provide minimal in-kind or financial support for the child.

Father argues that the court's finding of abandonment is not supported by substantial evidence. First, Father argues that he only learned he was the father of G.T.M. one month before the amended petition for termination was filed, so there is no evidence that he abandoned G.T.M. for the requisite six-month period. Second, Father argues that there is insufficient evidence of his intent to abandon G.T.M. Father points to evidence that, since learning of his paternity, he has demonstrated an interest in his son, participated to the extent possible in his treatment plan and promoted his family as a placement resource. We agree with both arguments.

■ Abandonment has been defined as either "a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent; or ... an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection." *In re Watson's Adoption,* 238 Mo.App. 1104, 195 S.W.2d 331, 336 (1946); *In re E.F.B.D.,* 245 S.W.3d 316, 324 (Mo.App.2008). "This largely presents an issue of intent, which is inferred from the parent's conduct." *E.F.B.D.,* 245 S.W.3d at 324; *In re Z.L.R.,* 306 S.W.3d 632, 635 (Mo.App.2010); *see In re P.L.O.,* 131 S.W.3d 782, 789 (Mo. banc 2004). Evidence of the parent's conduct, both before and after the requisite six-month period, may be considered. *In re J.B.D.,* 151 S.W.3d 885, 888 (Mo.App.2004). However, "[o]nly the parent's conduct *prior* to the filing of the petition for termi-

nation may be considered to establish the six-month period." *Id.* (emphasis added). The greatest weight must be given to conduct during the statutory period. *In re Adoption of C.M.B.R.,* 332 S.W.3d 793, 819 (Mo. banc 2011).

Here, because Father learned of his paternity only one month before the amended petition to terminate his parental rights was filed, there is simply no evidence of abandonment for the requisite six-month period. § 211.447.5(1) ("court shall find that the child has been abandoned if, *for a period of six months or longer . . .*"); *see, e.g., In re B.S.B.,* 76 S.W.3d 318, 326 (Mo. App.2002) (reversing termination of parental rights when "it is uncontroverted . . . that there was no period of six months or longer in which Father failed to visit or communicate with the children"); *In re C.J.G.,* 75 S.W.3d 794, 801 (Mo.App.2002) (six-month period of abandonment not established when period consisted of mother's concealment of paternity and later DFS custody; upon learning his child was in DFS custody, father "directed his efforts toward legal proceedings to allow his sister to gain custody [and] has persistently taken steps to protect his parental rights and establish a relationship with his child, up through and including this appeal").

In addition, there was no evidence that Father intended to abandon G.T.M. *See Z.L.R.,* 306 S.W.3d at 635–37. Since Father learned that he was G.T.M.'s father, Father promptly sent him an appropriate letter, informed his caseworker immediately of his intent to have custody of G.T.M., promoted his family as a placement resource in the meantime and essentially did "everything" asked of him except verification of completed programs while in pris-

on.[8] *See, e.g., id.* at 635. (reversing termination on the abandonment ground for lack of intent as Father did "everything" asked of him); *In Interest of Baby Girl W.,* 728 S.W.2d 545, 549 (Mo.App.1987) (evidence of Father's intent to abandon child is lacking when, after learning of paternity concealed from him, he refused to relinquish parental rights, sought appointment of counsel to represent him in contesting termination, resisted efforts of the juvenile officer to deprive him of his parental status, and further pursued the present appeal). We recognize Father's failure to provide financial and/or in-kind support shows a lack of concern for G.T.M. *See Z.L.R.,* 306 S.W.3d at 636; *In re J.M.S.,* 83 S.W.3d 76, 84 (Mo.App.2002). We conclude, however, that like the fathers in *Z.L.R.* and *J.M.S.,* Father sent correspondence to G.T.M. and to Grady regarding G.T.M. while in prison, and the cost incurred in maintaining this correspondence demonstrated his intent to continue the parent-child relationship. *Z.L.R.,* 306 S.W.3d at 636; *J.M.S.,* 83 S.W.3d at 84. Given the short time frame between Father learning of his paternity and the attempt to terminate his parental rights, we agree that the trial court's finding of abandonment is not supported by substantial evidence. Therefore, the trial court erred in relying upon abandonment as a statutory ground to terminate Father's parental rights. Point I is granted.

### Point II

In Father's second point, he contends the trial court erred in terminating his parental rights on the statutory ground of neglect. Section 211.447.5(2) authorizes a court to terminate parental rights if "[t]he child has been abused or

---

8.   Father did present evidence at trial that he was participating or had enrolled in certain programs available to him in prison. Given

the short time frame before trial, proof of enrollment may have been the most that he could provide.

neglected." *Id.* Relevant to this statutory ground for termination, a trial court is directed to make findings as to conditions or acts of the parent according to four factors. *See* § 211.447.5(2)(a)–(d). These four factors are:

(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development[.]

*Id.* "[P]roof of one such factor is sufficient to support termination on the statutory abuse or neglect ground." *In re S.M.B., Jr.,* 254 S.W.3d 214, 219–20 (Mo.App.2008).

In the case at bar, the trial court considered and made findings as to all four factors. The court did not rely upon the first three because there was no evidence showing their applicability. Regarding the fourth factor, the court found:

[d] Whether there was a repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development. The evidence established that ... the father had failed to maintain an emotional relationship with the child. [Father] failed to visit or otherwise contact the minor child. None of the parents provided financial or in-kind support. No evidence was presented of an inability on the part of [Father] to provide at least minimal support for the child. [Father has] failed to demonstrate the ability to provide the child with a stable and appropriate home environment.

*See* § 211.447.5(2)(d). Father contends the trial court's finding of neglect is not supported by substantial evidence because, after he learned he was G.T.M.'s father, he "wrote letters and sent documents requested by the worker and promoted his family as a placement resource, during the four months before trial." We agree.

In *In re Z.L.R.,* 306 S.W.3d 632 (Mo. App.2010), this Court also found that the trial court's finding of neglect was not supported by the evidence. *Id.* at 637–38. On facts similar to those in this case, we explained that the father's small prison income precluded meaningful financial support, and that the father already was jailed when he first learned of his child, so he could not personally provide her shelter, but he proposed willing relatives whose home studies were approved. *Id.* at 637. We concluded the trial court's finding of neglect had to be reversed. *Id.* at 637–38; *see J.M.S.,* 83 S.W.3d at 84.

We reach the same conclusion here. Although we have no evidence of Father's income while in prison in this case, given the short time after he learned of his paternity and before trial, we similarly conclude that Father's failure to provide financial or in-kind support does not show a repeated and continuous failure to provide for G.T.M. *See Z.L.R.*, 306 S.W.3d at 637. As in *Z.L.R.*, soon after Father was told that he was G.T.M.'s parent, Father proposed willing relatives as a placement resource until his expected release in April 2012. After that occurred, Father intended to care for G.T.M. The fact that Father did not provide Grady with specific plans of what he was going to do upon release from prison is similarly not determinative of neglect, given the short amount of time Father has had to make any such plans. He otherwise has cooperated with the Division in nearly every way possible thus far to eventually care for G.T.M. Lastly, contrary to the court's finding, Father did attempt to contact G.T.M. by writing him a letter soon after he learned that he was G.T.M.'s father. Based upon our review of the record, the trial court's finding that Father repeatedly or continuously failed, although physically or financially able, to provide G.T.M. with adequate support is not supported by substantial evidence. *See Z.L.R.*, 306 S.W.3d at 637–38; *In re B.S.B.*, 76 S.W.3d 318, 332 (Mo.App.2002). Therefore, the trial court erred in relying upon neglect as a statutory ground to terminate Father's parental rights. Point II is granted.[9]

After a thorough review of the record, we conclude that neither statutory ground for termination is supported by substantial evidence. Accordingly, the part of the judgment terminating Father's parental rights to G.T.M. is reversed.

SCOTT, J., and FRANCIS, P.J., concur.

---

9. Father also presents a third point challenging the trial court's finding that termination was in G.T.M.'s best interest. Because we conclude that the trial court erred in finding that either statutory ground for termination exists, Point III is moot. *See Z.H. v. G.H.*, 5 S.W.3d 567, 572 n. 4 (Mo.App.1999).